St. Louis-San Francisco Railway Company v. Sub-District No. 1 of Drainage District No. 11.

Opinion delivered May 20, 1929.

568

A. F. Barham, E. T. Miller, E. L. Westbrooke, Jr., and E. L. Westbrooke, for appellant.

James G. Coston and J. T. Coston, for appellee.

SMITH, J. By appropriate orders of the county court of Mississippi County, a drainage district, known as Subdistrict No. 1 of Drainage District No. 11 of that county, was created. The subdistrict is substantially identical with the original district, and its primary purpose appears to have been to reopen, clean out and to enlarge and deepen the ditches of the original district. It does not appear just when the original district was completed, but testimony was offered on behalf of the railway company, which filed protests against its assessments, that it had paid taxes in the original district for sixteen years.

The subdistrict, as it is called, contains 29,201 acres of land. The main line of the St. Louis-San Francisco Railway Company runs through the district for 8.4 miles and a branch line for a distance of 4 miles. The railway company protested in the county court, upon the organization of the subdistrict, and obtained there a substantial reduction in its assessments, but, feeling aggrieved that no greater reduction had been made, appealed to the circuit court, and, failing there to obtain additional relief, prosecuted this appeal to this court.

The Bank of Commerce & Trust Company, as trustee for the Menasha Outing Club, also filed protests in the county court against the assessments of its lands, and

appealed from the order of the county court refusing to reduce its assessments. On the appeal to the circuit court a reduction of fifty per cent. was made in the assessment of a quarter section of the trustee's lands, but, as no other relief was given, the trustee has appealed.

These protests were heard together in the county and circuit courts, and come here as a single appeal. No other property owners in the district appealed.

The chief objection to the assessments complained of is that they were made arbitrarily and without reference to the relative benefits to be derived from the improvement, and by commissioners as a board of assessors who were ignorant of and indifferent to the facts upon which an equitable assessment would have to be based.

There are three commissioners in the district, but one of them was not called as a witness. The other two testified that they had been born and reared in the district and knew intimately every part of it. The commissioners decided that the lands should be assessed at from $4 to $60 per acre, the highest lands and those with the best natural drainage to have a betterment assessment of $4 per acre, while the lowest and wettest lands should be assessed at $60 per acre. Other lands were graduated between these extremes. In order to determine the classification of the respective tracts, the engineer of the district was ordered to run levels, and this was done, and the result of this survey was indicated on a map of the district. Because the assessment of benefits to be imposed was in most cases a mere matter of applying these figures of the engineer, it is earnestly insisted that the assessments were in fact made by that officer, and not by the commissioners, who were charged with this duty under the law.

This does not follow. It is true the assessments were determined by the facts as found by the engineer, but the commissioners were entitled to have the benefit of this information in determining the elevations and the relative benefits; and, while it is true that the calcula-

tions determining the assessment of each tract were made by the engineer, this was done under instructions from the commissioners, who had previously determined the basis of the assessment, and it was therefore the assessment of the commissioners. After these calculations had been made and the assessments arrived at, the commissioners met and spent about half a day verifying the assessments as compiled by the engineer.

It was shown by the commissioners who testified that, in addition to their previous long familiarity with the lands of the district, they had made special observations of portions of the district, and had in a number of cases changed the assessments made by the engineer, where they thought it proper to do so. In connection with this work, one of the commissioners testified that he spent three days on his horse riding over the district. But, at last, no information could be as accurate or was as necessary as that revealed by the levels which the engineer had run.

We conclude therefore that the court below was warranted in finding against the contention of the protesting property owners that the commissioners delegated their duty to assess the lands to the engineer.

The showings was made that the main line of the railroad ran through some of the highest lands in the district, yet the right-of-way of its main line was assessed at $4,250. The railroad right-of-way is 100 feet wide, and it was shown that the acreage of its main line right-of-way was 98.6 acres, which would make an average assessment of $43.10 per acre. The four miles of the branch line had an acreage of 48.4 acres, which was assessed at $750, which is $15.49 per acre. The total acreage of both the main and branch lines is 147 acres, and the total assessment of benefits is $5,000, making the average assessment per acre $34.01.

The district contains no cities or towns, but there are three villages in it, and the assessments there were on a basis of $60 per acre, although the property in the

villages was assessed as lots. These villages are situated on the highest lands in the district, but the commissioners stated that the right-of-way of the railroad main line and the town lots were given an assessment higher than the elevation of these properties would otherwise have taken because of the intensive use made of them. We are unable to say that this was an arbitrary thing to do.

There was testimony on the part of the railway company to the effect that its tracks were laid upon an embankment higher than the surface water ever reached, and that it maintained ditches along its right-of-way, and it insists that this testimony establishes the fact that it can receive but little benefit from the proposed improvement. It was shown, however, that the railroad ditches drained into a large natural watercourse known as "Frenchman's Bayou," and that the improvement district furnished an outlet for the waters of this bayou. The general course of the drainage ditches is southwest, and the main line of the railroad runs in the same direction. The railroad crosses Frenchman's Bayou near the west boundary of the district, and the maps of the district indicate that from this point south the bayou affords no drainage to the railroad right-of-way; but, although the drainage district extends two miles south of this point of intersection of the railroad and the bayou to the south county line, the railroad is excluded from this portion of the district, notwithstanding the line of the railroad right-of-way is the boundary of the district to the county line, so that the portion of the railroad south of the point of intersection of the railroad and the bayou is not included in the district.

An improved concrete road constructed by Road Improvement District No. 1 of Mississippi County, which runs through this drainage district, was not assessed on an acreage or any other basis, and it is insisted that this failure increases proportionately the amount of taxes all other lands in the district will pay, and invalidates the entire assessment.

572

The recent case of *Board of Commissioners of Buffo Drainage District* v. *Arkansas County, ante,* p. 91, is against this contention. The drainage district in that case, like the one in the instant case, was organized under §§ 3607 *et seq.,* C. & M. Digest, known as the alternative system of drainage districts, and it was there held that the statute under which the drainage district was organized failed to provide any method of assessing or collecting taxes against county roads.

The assessment records, containing the description under which the various tracts of land have been assessed, appear in the record, and the motion for a new trial assigns as error the alleged fact that numerous descriptions are so fatally defective that the tax lien could not be enforced against lands thus described, in the event taxes were not paid on them.

This assignment of error might be disposed of by saying that the motion for a new trial does not call to our attention any particular description which is said to be fatally defective, but of the descriptions discussed it may be said a number referred to private surveys. So far as the record before us shows to the contrary, these descriptions may be good and sufficient. The statute provides for the survey of lands not in cities or towns into subdivisions so that the descriptions employed in the Government surveys may not always be essential. Provision is made in § 9932, C. & M. Digest, for a record book, to be entitled "Record of Surveyors' Plats and Notes," and by § 9933, C. & M. Digest, it is provided that assessments may be made with reference to these surveys. See also § 9928, C. & M. Digest.

Neither of appellants complain that their property is assessed under descriptions which, if employed in their receipts, would not afford them protection; but their complaint is that their assessments may be increased because other owners may not be required to pay because of defective descriptions.

Under act 661 of the Acts of 1919 (General Acts 1919, page 457), it is provided that any ten property owners in an improvement district may petition the county court to cure any defects or irregularities in the organization of the district, and this act may be employed, if found necessary, to collect taxes from delinquent owners. Besides, act 203 of the Acts of 1927 (Acts 1927, page 680), entitled, "An act in aid of drainage districts," provides that commissioners of drainage districts shall have power to make re-assessments each year. Moreover, it is not questioned that nearly ninety per cent. of the land in the district is assessed under descriptions which are unobjectionable.

So far as the lands of the appellant bank as trustee are concerned, it does not appear that any just cause of complaint exists that any discrimination was practiced, as these assessments appear to be similar to those of all other landowners. As has been said, the court found that an error had been made as to one quarter section of the bank lands, and a fifty per cent. reduction in that assessment brought it in line with other assessments.

It is earnestly insisted that error was committed in overruling a motion for a continuance. The ground for this motion is that the levee of the St. Francis Levee District, protecting all the property in the district from the annual overflow of the Mississippi River, forms the eastern boundary of the district. In the southeast portion of the district the river makes a wide bend, and it is alleged that it is proposed to shorten this levee line by running the levee across, instead of around, the bend. If this is done, that portion of the land left outside of the levee can then receive no benefits from the drainage ditches, as the new levee will make it impossible for the lands outside of the levee to drain into the ditches. In overruling this motion for a continuance, the court evidently took the view that the construction of this new levee was uncertain, and the continuance was not asked

574

by the landowners whose lands would be excluded from the benefits of the drainage district if this new levee were built. One of the commissioners who testified in the case was shown to be one of the largest landowners in that area. It is not contended that the construction of this levee will affect the benefits which the property of the appellants will derive from the proposed improvement, and there was therefore no prejudice, so far as they were concerned, in overruling the motion for a continuance.

Certain other objections to the district are discussed, but they relate to matters which have heretofore been decided adversely to the contention of appellants; and, as no error appears in the record, the judgment must be affirmed, and it is so ordered.